Melinda Daina BILLINGSLEY, individually, Melinda Daina Billingsley, as next friend of Anthony Ray Billingsley, and John T. and Eleanor Billingsley, Plaintiffs–Respondents,

v.

FORD MOTOR COMPANY, Defendant–Appellant.

Nos. 20987, 20988.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 28, 1997.

Motion for Rehearing and Transfer Denied Feb. 20, 1997.

Application to Transfer Denied March 25, 1997.

Michael J. Patton, Turner, Reid, Duncan, Loomer & Patton, Springfield, George E. Feldmiller, David L. Heinemann, Stinson, Mag & Fizzell, Kansas City, for appellant.

John E. Price, Price, Fry & Robb, Richard E. Davis, Whiteaker & Wilson, Springfield, for respondents.

SHRUM, Judge.

These consolidated appeals by the defendant, Ford Motor Company (Ford), are before this Court for the second time.[1] In No. 20988, Ford appeals the denial of a motion to set aside a default judgment for Plaintiffs. This default judgment, dated April 30, 1996, re-entered the same default judgment that was entered on April 6, 1995, but apportioned damages among Plaintiffs. The judgment was entered in Plaintiffs' action for wrongful death and injuries arising out of a motor vehicle accident. Ford filed a motion to set aside the judgment in accordance with Rule 74.05(d),[2] asserting that it had a meritorious

---

1. The first appeals were presented to this court in 1995, after the trial court entered a default judgment against Ford on April 6, 1995, and denied Ford's motion to set aside the default judgment on May 5, 1995. On May 15, 1995, Ford filed its notice of appeal of the trial court's April 6, 1995, entry of a default judgment. On that same date, Ford filed its separate notice of appeal of the trial court's May 5, 1995, order denying the motion to set aside the default judg-

ment. This court dismissed the prior appeals for lack of a final appealable judgment due to the trial court's failure to apportion damages among the various plaintiffs. *See Billingsley v. Ford Motor Co.*, 913 S.W.2d 137 (Mo.App.1996).

2. All references to rules are to Missouri Rules of Civil Procedure (1996) unless otherwise noted.

defense to Plaintiffs' claims and that there was good cause to set aside the judgment.

In No. 20988, this Court reverses the order denying the motion to set aside the judgment. The case is remanded and the trial court is directed to set aside the default judgment and allow Ford a reasonable time in which to file an answer.

In No. 20987, Ford attempts to appeal from the default judgment itself. However, in disposing of No. 20988, this court has accorded Ford all the relief it seeks in No. 20987, thus rendering moot the questions presented by No. 20987. Accordingly, No. 20987 is dismissed.

John Billingsley II (Deceased), died from injuries he sustained on May 6, 1992, when his 1988 Ford Bronco II "rolled over" as he attempted to avoid an oncoming white car in his lane of traffic. Deceased's wife and son, passengers in the Bronco II, were also injured.[3] The identity of the driver of the "white car" was never determined, and in their eventual lawsuit, Plaintiffs assigned the name "John Doe" to that unknown defendant.

Following the accident, Plaintiffs hired the Springfield, Missouri, law firm of Woolsey, Fisher, Whiteaker & McDonald (Woolsey Fisher) to pursue their claims against Ford for damages resulting from this accident. In May 1993, Woolsey Fisher sent a settlement brochure to attorneys W. Russell Welsh (Welsh) and Douglas S. Laird (Laird) of the Kansas City firm of Polsinelli, White, Vardeman & Shalton (Polsinelli White) in which they told them about the accident and Plaintiffs' claims against Ford. We glean from the record that Woolsey Fisher's initial contact was with Polsinelli White rather than Ford because of Woolsey Fisher's considerable experience with Polsinelli White in other cases involving Ford products.

Welsh testified that he had a lengthy attorney-client relationship with Ford, having represented them "since 1981 continuously." By 1993, Polsinelli White was regional counsel for Ford, and Welsh was the "responsible attorney primary contact with Ford."

Once Woolsey Fisher notified Polsinelli White of Plaintiffs' claim, the two firms engaged in several pre-suit activities to evaluate Plaintiffs' claims. For example, Plaintiffs provided Polsinelli White with medical information. Lawyers from Polsinelli White also took sworn statements from Wife, Parents, and two psychologists who had treated Wife and Son. Polsinelli White personnel and automotive engineers acting for Ford performed a videotaped inspection of the Bronco II. Lawyers from the two firms talked settlement but none was reached.

On February 8, 1995, Plaintiffs filed suit against Ford and "John Doe" in Polk County. Discovery requests were included as part of Plaintiffs' February 8 filings. Attorney Richard E. Davis (Davis) of Woolsey Fisher sent a courtesy copy of the petition to Laird at Polsinelli White on February 10, 1995. Davis' letter to Laird on the same date included this paragraph:

> "Under separate cover you will receive courtesy copies of all pleadings and discovery filed in the above captioned matter on February 8, 1995. I assume, but do not know, that your office will be handling the defense of this matter on behalf of Ford Motor Company."

Ford's registered agent in Missouri was served with the summons, petition, and discovery requests on February 15, 1995. The suit papers served on Ford's registered agent were in the hands of John L. Wanamaker (Wanamaker), a senior attorney in Ford's office of general counsel, by February 22, 1995. On that date Wanamaker mailed the documents to Welsh at Polsinelli White with instructions that they should "enter an appearance on behalf of [Ford] and take such steps as immediately necessary to protect its interests, consistent with the guidelines set out below." The assignment letter also states:

> "Pleadings ... you propose to file with the Court, must have my approval. I should receive a copy of the draft you propose to file at least five (5) business days before it is due to be filed.... After

3. Plaintiffs and their relationship to Deceased are as follows: Melinda Daina Billingsley (Widow), Anthony Ray Billingsley (Son), and John T. and Eleanor Billingsley (Parents).

reviewing the draft, unless unforeseen circumstances or conflicts arise, I will contact you with my thoughts, comments, suggestions or revisions. *All documents should be filed in a timely manner and, accordingly, you should file the proposed draft in final form if you have not heard from me before it is due.*"

Welsh received the suit papers from Wanamaker on February 23. He immediately dictated a letter to Wanamaker in which he confirmed that Polsinelli White would represent Ford in the case. Welsh's letter to Wanamaker also stated that he was assigning the case to Polsinelli White associate, David Boman (Boman). Welsh testified that when he dictated the letter to Wanamaker, he directed that a copy thereof be sent to Boman. This was in keeping with the usual practice in the firm that the acknowledgment letter to the client also served to notify an associate such as Boman of his responsibility to prepare responsive pleadings in the case. Welsh dictated the client acknowledgement letter on a cassette tape dictation system. Welsh's secretary, Randi L. Kuhl (Kuhl), typed the letter in draft form but the letter did not go out as Welsh had anticipated. Welsh testified that he did not know the exact reason the letter was not placed in final form and mailed. However, he did suggest two possibilities: First, that he "returned the draft to [Kuhl] and she for whatever reason either mislaid it or didn't type it[;]" or second, "I did not return the draft to [Kuhl]." Thus, although Welsh "intended to get this [assignment letter] to . . . Boman so that he could file the answer as we were directed to do[,]" Boman received neither the assignment letter nor Plaintiffs' petition, summons, and discovery requests. Consequently, Boman knew nothing of his assigned responsibility regarding the suit, and the March 17, 1995, deadline for Ford to plead to Plaintiffs' petition passed without any response.

Welsh testified that in the six-week period after dictating the assignment letter, he first was preparing for a two-week trial in another matter and then was away from his office. From March 8 to March 21—the time frame in which the answer deadline passed—Welsh

was in trial in Jefferson City. Immediately thereafter, Welsh left on a vacation and was gone until April 3, 1995.

On Monday, March 20, 1995, the first business day after a response to Plaintiffs' petition was due, Plaintiffs moved for and obtained an interlocutory order of default.[4] Neither Ford nor its lawyers were notified of the filing of the motion or the entry of the default judgment. However, on the same date as the interlocutory judgment (March 20, 1995), Davis mailed to Welsh a service copy of an affidavit of publication concerning "John Doe." Upon Welsh's return to his office on April 3, 1995, he discovered Davis' letter to the circuit clerk enclosing the affidavit of publication. He then forwarded this cover letter to Boman with a note asking if the case had been removed to federal court. Welsh's note resulted in Boman checking their file, whereupon he discovered the summons and petition but no removal or responsive pleadings. Boman immediately commenced work on an answer. It was completed April 4 and filed in the circuit clerk's office on April 5, 1995. However, the answer was filed without Ford having obtained leave of court.

Other significant events occurred in this case on April 3, 1995. To explain one of these events, we digress briefly to explain that when Wanamaker assigned the case to Polsinelli White, it was with the instruction that "[d]iscovery directed to Ford should be sent to . . . Snell & Wilmer" (a Phoenix, Arizona, law firm) and that "[l]ocal counsel should not prepare any drafts of responses [to discovery requests] until authorized to do so." Accordingly, the discovery requests that accompanied Plaintiffs' summons and petition were sent to Snell & Wilmer. The Snell firm prepared an initial draft of discovery responses and lawyers at Polsinelli White then placed them in final form. That work was completed on April 3, 1995, whereupon Boman mailed Ford's discovery responses to Plaintiffs' lawyers.

The other significant event of April 3, 1995, was that Plaintiffs procured a trial setting for April 6, 1995, without notifying Ford or its

**4.** March 17, 1995, fell on a Friday, hence the next business day was Monday, March 20, 1995.

attorneys. A docket entry on that date reads:

"Per phone conversation with Atty. R. Davis—court date of April 6, 1995, 1:00 pm. Sent copy of billing letter sent prematurely to Ford Motor Co. to Mr. Davis upon his request."

On April 6, 1995, the trial court heard evidence in support of Plaintiffs' request for the determination of damages and entry of default judgment. No one appeared at the hearing on behalf of Ford. In a written stipulation signed later by Davis, he stated that "Plaintiffs' attorneys are unaware that any notice of the evidentiary hearing held on April 6, 1995, was given to [Ford] or any of its attorneys prior to said hearing . . . ." In that stipulation Davis also acknowledged that he "saw that the document entitled defendant's 'Answer' had been filed on April 5, 1995, before he presented evidence at the hearing on April 6, 1995, and advised the court of its presence in the court file before said hearing." Additionally, the docket sheet records that Ford's discovery requests were filed in the clerk's office on April 5, 1995. After Plaintiffs presented their evidence on April 6 in support of their request for a money judgment, they were allowed to dismiss their suit against John Doe without prejudice to refiling. The trial court then entered judgment for Plaintiffs for $4,866,445 in actual damages and $2,608,366 in punitive damages.

Welsh first learned of the April 6 default judgment on Friday, April 7, 1995. He and other lawyers at Polsinelli White worked over that weekend preparing a motion to set aside the judgment based on Rule 74.05. Such motion, in verified form, was filed on April 10, 1995. After an evidentiary hearing on Ford's motion held on May 5, 1995, the trial court denied Ford's request for relief.

In refusing to set aside the default judgment, the trial court noted that "the ball was dropped [at Polsinelli White]," yet it saddled Wanamaker with the primary responsibility for the default. The court felt that Wanamaker had tied the hands of Polsinelli White with excessive requests for review of their work product, and concluded that the procedures set in place by Wanamaker amounted to reckless action which precluded setting aside the default.

Ford then filed its first appeal to this court from the default judgment and the judgment denying its motion to set aside the default judgment. This court determined that because the default judgment failed to apportion damages among Plaintiffs, it was so indefinite as to be void. Accordingly, this court dismissed Ford's appeals from the void default judgment and the order refusing to set aside that void judgment. *See* note 1 above.

On remand, the trial court re-entered a default judgment for Plaintiffs for $4,866,445 in actual damages and $2,608,366 in punitive damages but apportioned the damages among Plaintiffs. Three days later Ford filed its motion to set aside the new default judgment which the trial court promptly overruled. These appeals followed.

Ford's motion to set aside the default judgment is based on Rule 74.05(d). This rule applies specifically to default judgments and requires that a motion to set aside such a judgment shall be for "good cause shown" which includes a mistake or conduct not intentionally designed to impede the judicial process. *LaRose v. Letterman,* 890 S.W.2d 347, 351 (Mo.App.1994).

Ford's first point relied on maintains that the trial court erred in denying its motion to set aside the default judgment because Ford had demonstrated good cause as to why it did not timely plead.[5] Ford asserts that its motion to set aside the default judgment was timely and that there was no reckless behavior or other intent to impede the judicial process.

5. Ford's first point also contends that it demonstrated a "meritorious defense" and thus satisfied that element of Rule 74.05(d). Plaintiffs concede that argument in their brief, saying: "For purposes of its motion to set aside the default judgment only, Plaintiffs agree that Ford has properly pled a meritorious defense as provided for in Rule 74.05." Consequently, this court need consider only the "good cause" and timeliness issues presented by Ford's first point.

■ The applicable scope of appellate review is stated in *Keltner v. Lawson*, 931 S.W.2d 477 (Mo.App.1996):

"'The trial court has the discretion to set aside a default judgment, and its decision will not be interfered with unless an abuse of discretion is found. *Bell v. Bell*, 849 S.W.2d 194, 197 (Mo.App.1993); *Moore v. Dahlberg*, 810 S.W.2d 730, 732 (Mo.App. 1991). The discretion not to set aside a default judgment, however, is a good deal narrower than the discretion to set one aside. *LaRose v. Letterman*, 890 S.W.2d [347] at 350 [Mo.App. 1994]. Thus, appellate courts are more likely to reverse a judgment which fails to set aside a default judgment than one which grants that relief. *Moore v. Dahlberg*, 810 S.W.2d at 732. This is because of the law's distaste for default judgment and its preference for trials on the merits. *See LaRose v. Letterman*, 890 S.W.2d at 350; *Gibson v. Elley*, 778 S.W.2d [851] at 854 [Mo.App. 1989].'"

*Id.* at 479[1] (quoting *Myers v. Pitney Bowes, Inc.*, 914 S.W.2d 835, 838 (Mo.App.1996)).

■ In adopting Rule 74.05(d), the Supreme Court "considerably broadened" the discretion of a trial court to forgive the mishandling of legal documents. *Myers*, 914 S.W.2d at 839. Under the current version of this rule, "[w]here reasonable doubt exists as to whether the conduct was intentionally designed or irresponsibly calculated to impede the work of courts, it should be resolved in favor of good faith." *Id.* at 839[5].

As mentioned in note 5 above, Plaintiffs have conceded that Ford has established the "meritorious defense" element of Rule 74.05(d). Thus, the only Point I issues are whether Ford proved "good cause," and the timeliness of its Rule 74.05(d) motion.

### Good Cause

■ This court has noted that although the good cause element of Rule 74.05(d) eludes "'precise definition,'" it "'obviously intends a remedial purpose and is applied with discretion to prevent a manifest injustice or to avoid a threatened one.'" *In re Marriage of Williams*, 847 S.W.2d 896, 900

(Mo.App.1993) (quoting *B __ L __ C(K) v. W __ W __ C __*, 568 S.W.2d 602, 605[4] (Mo. App.1978)).

■ "Good cause" under Rule 74.05 for failure to timely file an answer was addressed in *Myers:*

"The good cause requirement of Rule 74.05(d) is satisfied by proving that the party in default did not recklessly or intentionally impede the judicial process. *Great S. Sav. & Loan Ass'n v. Wilburn*, 887 S.W.2d 581, 584 (Mo. banc 1994); *LaRose v. Letterman*, 890 S.W.2d at 351; *Plybon v. Benton*, 806 S.W.2d 520, 524 (Mo.App. W.D.1991). While the prior version of Rule 74.05 was interpreted to mean that a defendant who negligently failed to file a timely answer should be denied relief, the amended rule clarifies that '"good faith mistakes do constitute good cause, and a default judgment can be vacated *even if the movant has negligently failed to file a timely answer.*'' *Newton v. Manley*, 824 S.W.2d 522, 524 (Mo.App. S.D.1992) (quoting Laughrey, *Judgments—The New Missouri Rule*, J.Mo.Bar 11, 15 (Jan.-Feb. 1988))."

914 S.W.2d at 839[4].

In analyzing the term "reckless" in the context of Rule 74.05, this court has looked to its dictionary definition, i.e., "'reckless' is, 'lacking in caution: deliberately courting danger.' WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1896 (1971)." *Williams*, 847 S.W.2d at 900. In *Williams*, this court also impliedly recognized the applicability of the RESTATEMENT[6] definition of "reckless" when analyzing a Rule 74.05 case:

"'Recklessness differs from negligence also in kind. A person is negligent, if his inadvertence, incompetence, unskillfulness or failure to take precautions precludes him from adequately coping with a possible or probable future emergency.' Restatement, § 500, Comment g. To be reckless, a person makes a conscious choice of his course of action, 'either with knowledge of the serious danger to others involved in it or with knowledge of the facts which would

---

**6.** *See* RESTATEMENT (SECOND) OF TORTS, § 500, CMT. g    (1965).

disclose the danger to any reasonable man.' "

*Id.* (quoting *Gibson by Woodall v. Elley,* 778 S.W.2d 851, 854) (Mo.App.1989) and *Farm Bureau Town & Country Ins. Co. v. Turnbo,* 740 S.W.2d 232, 235 (Mo.App.1987).

■ Based on the facts of this case, the conclusion that Ford failed to show good cause is erroneous. In reaching that conclusion, we first analyze the behavior and conduct of Wanamaker.

When Ford received the summons, petition, and discovery, Wanamaker immediately arranged for legal counsel by hiring Polsinelli White. Specifically, twenty-two days before an answer was due, Wanamaker sent Plaintiffs' petition, summons, and discovery requests to Polsinelli White with instructions to "enter an appearance on behalf of [Ford] and take such steps as immediately necessary to protect its interests, consistent with the guidelines set out below." We do not agree with the trial court that any of the "guidelines" in the assignment letter, including the directive that Wanamaker was to review pleadings before they were filed, constitutes "conduct recklessly designed to impede the judicial process." In the same paragraph where the "review" directive was given, Wanamaker emphasized that all documents were to be "filed in a timely manner and, accordingly, [Polsinelli White was to] file the proposed draft in final form" if it had not heard from Wanamaker before the pleading was due. Significantly, the default did not stem from Wanamaker's guidelines or directives in his assignment letter nor from his desire to review the pleadings, but as the trial court noted, "[t]he ball was dropped in Kansas City." Moreover, the timely filing of discovery responses hardly bespeaks a lack of control over the case by Ford.

Although Plaintiffs argue in conclusory fashion that "Ford chose to retain significant control of the defense of this case" and then "consciously failed to exercise any control whatsoever," the evidence they cite to support that argument suggests, at most, negligence on Wanamaker's part. Thus, evidence that Wanamaker did nothing to verify that Polsinelli White had received the suit papers and assignment letter, neither calculated the

due date for the answer nor directed anyone else to do so, and "did not follow up with attorney Welsh for acknowledgment of receipt of the file," may support a finding of negligence, i.e., that by such omissions Wanamaker did not adequately cope with the possibility of the case going into default if Polsinelli White did not receive the assignment or failed to act upon it when received. *See* RESTATEMENT, note 6 above; *See also Williams,* 847 S.W.2d at 900; *Gibson,* 778 S.W.2d at 854. However, this court does not agree that such evidence, even when considered in light of the assignment letter, supports a finding that Wanamaker deliberately courted danger or consciously chose a course of action "either with knowledge of the serious danger to [Ford] . . . or with knowledge of . . . facts which would disclose the danger to any reasonable man." This conclusion is buttressed by the uncontroverted evidence that Wanamaker promptly assigned the defense of this case to lawyers with whom Ford had a lengthy relationship and a firm Ford had recently chosen as its regional counsel for three states. Nothing in this record reveals any prior mistakes, internal mishaps, or negligence by Polsinelli White in its representation of Ford nor does the record reveal any facts peculiar to this case which disclosed or should have disclosed to Wanamaker, when measured by the "reasonable man" standard, that a default judgment might occur if he did not personally determine and calendar the response date and personally intervene to confirm that the deadline was met. Under the circumstances, Ford did not engage in conduct designed to impede the judicial process by reason of Wanamaker's behavior. *See Great Southern Sav. & Loan Ass'n v. Wilburn,* 887 S.W.2d 581 (Mo.banc 1994); *Plybon,* 806 S.W.2d at 520.

■ In another prong of Point I, Ford contends that the facts surrounding Polsinelli White's mishandling of the suit papers do not support a finding that Ford "intentionally or recklessly designed to impede the judicial process." This court agrees.

When Welsh received the assignment letter and suit documents from Ford, he did not ignore them, but instead dictated a client acknowledgment letter with a directive that

other lawyers in the firm, including Boman, receive copies. The in-house copy of the client acknowledgment letter was the procedure at Polsinelli White to notify other lawyers of their duty to enter the firm's appearance in a case and file responsive pleadings. Welsh's secretary typed the draft copy of the assignment letter, but the final version was never completed or distributed to anyone. Consequently, the suit papers were not timely delivered and Boman knew nothing of his assignment to file responsive pleadings. After Welsh dictated the acknowledgment letter, he commenced work on other litigation, and in fact, was in the midst of a two-week trial when the time to answer passed. The day Welsh returned to his office, April 3, 1995, he found on his desk the courtesy copy of Davis' letter concerning the John Doe affidavit of publication.[7] The presence of the John Doe letter triggered an inquiry from Welsh to Boman about whether this case had been removed to federal court. Upon examining the file, Boman found the petition and summons but no responsive pleadings. Polsinelli White immediately prepared an answer and filed it, but without obtaining leave of court to do so and without knowledge that the interlocutory judgment had been entered.

Concerning Welsh's conduct, Plaintiffs advance an argument similar to their interpretation of Wanamaker's actions, namely that Welsh, as the responsible attorney at Polsinelli White, was "lacking in caution," and hence was "reckless" when he failed to calculate the answer date, calendar or docket the response date, did nothing to insure that the acknowledgement letter was sent out in final form to Wanamaker, and did nothing to ensure that Boman had in fact received his direction to prepare a responsive pleading. Again, we agree that such evidence would support a finding of negligence, in that Welsh's conduct precluded him from adequately coping with in-firm office mistakes or the mishandling of the client acknowledgement letter and suit papers, possible nondelivery of such documents to Boman, and the

resultant failure to file a timely response. *See Williams,* 847 S.W.2d at 900; RESTATEMENT, n. 6 above. However, we are not persuaded that these facts support a finding of recklessness. As noted earlier, nothing in this record reveals that Polsinelli White's use of the client acknowledgment letter as a method of case assignment had failed previously nor does it reveal any facts peculiar to this case which disclosed to Welsh or should have disclosed to him, when measured by the "reasonable man" standard, that a default judgment might occur if he did not personally calculate and calendar the response date and thereafter monitor the client acknowledgment letter and its copies. *See Williams,* 847 S.W.2d at 900; RESTATEMENT, n. 6 above.

Similar facts in *Keltner,* 931 S.W.2d at 478–479, were found to be good cause for setting aside a default judgment. In that case, as here, the lawsuit arose out of a fatal motor vehicle accident. When the plaintiff sued, the defendant promptly sent the summons and petition to his insurance company, American International Group Services, Inc. (AIG). The head of AIG's litigation unit, Jennifer Hale, received the suit papers and assigned the case to AIG litigation specialist, Melony Najim. On March 2, 1995, Najim arranged with the plaintiff's lawyer to extend AIG's answer date to April 3, 1995. Approximately one week later, Najim resigned and her files were given to John Riley, an AIG employee from another unit. Riley was told to review the file and give a recommendation about it to Hale, who was then to consult with AIG's Service Center Manager. After Riley reviewed the file, he placed it and his case evaluation in Hale's "basket." However, by that time Hale was away from work for several weeks because of an injury. Although AIG's company policy provided for her basket to be checked periodically in her absence so that files would not go unattended, the file was not discovered until one or two days after the answer was due. On April 4, 1995, the plaintiff moved for and was granted a default judgment. The defendant

---

7. Since Plaintiffs obtained an interlocutory default judgment against Ford on March 20, 1995, for want of responsive pleadings by Ford and considering that as of March 20, 1995, no lawyer had yet appeared of record for Ford, we leave it to the reader to speculate why on that day, Plaintiffs' counsel sent Polsinelli White copies of the John Doe affidavit of publication and the letter to the circuit clerk that accompanied the affidavit.

appealed from the trial court's refusal to set aside the judgment. This court reversed, holding that good cause to set aside the default was clearly present.

"Here, as in *Myers, Gibson,* and *McClelland* [*v. Progressive Casualty Ins. Co.,* 790 S.W.2d 490 (Mo.App.1990) ], there was no evidence that defendant engaged in conduct designed to impede the judicial process. The failure to timely plead was the result of defendant's insurer's mishandling the legal documents that were served on defendant. The papers were promptly transmitted to the insurer, but because of its personnel problems, delays resulted so that no attorney was retained nor pleadings filed. Defendant demonstrated good cause for having failed to timely plead."

*Id.* at 481[6].

As in *Keltner,* there was no evidence that this defendant (Ford) engaged in conduct designed to impede the judicial process. Both the evidence about Wanamaker's conduct and also about what happened at Polsinelli White would support a finding of negligence but not a finding of recklessness. *See Myers,* 914 S.W.2d at 839; *Gibson,* 778 S.W.2d at 854; *Great Southern Sav. & Loan Ass'n,* 887 S.W.2d at 584. We hold that Ford presented facts sufficient to constitute good cause for its failure to appear and defend as required by Rule 74.05(d).

### *Timeliness of Ford's Motion*

■ Under Rule 74.05(d), a motion to set aside a default judgment must be filed within a reasonable time. *Myers,* 914 S.W.2d at 839[6]. "The sooner the mistake is discovered, and acted upon, the more receptive the courts should be to a motion to set aside." *Id.* at 839.

■ Here, Ford filed a motion to set aside the April 6, 1995, judgment on April 10, 1995.[8] These filings were within twenty-four days after the answer was due, twenty-one days after entry of the interlocutory judg-

ment, seven days after Ford found that the case was in default, and three days after it learned of the final default judgment. The trial court ruled on Ford's interlocutory judgment of default on May 5, 1995. When the case was remanded and the trial court had re-entered the default judgment with the required apportionment, Ford filed its motion to set aside the judgment three days thereafter.

In *Keltner,* 931 S.W.2d at 482, this court reversed a judgment denying a motion to set aside a default judgment where the motion was filed on the thirtieth day after entry of the default judgment. In *Myers,* a motion to set aside a default judgment filed twenty-nine days after the judgment entry was held reasonable and the trial court's denial of the Rule 74.05(d) motion was reversed. 914 S.W.2d at 835. *See also Newton,* 824 S.W.2d 522 (reversing a judgment denying a motion to set aside a default judgment which was filed forty-two days after the entry of the judgment).

Here, Plaintiffs argue that Ford's failure to obtain leave of court before filing its out-of-time answer on April 5, 1995, was itself designed to impede the judicial process; yet they do not support that argument with citation to authority, logical reasoning, or evidence from which such design could be found or inferred. Ford's aborted attempt to file an answer without obtaining leave was after entry of the interlocutory default judgment, hence could not and did not serve the purpose of impeding the judicial process. *See Newton,* 824 S.W.2d at 525. We hold that Ford's motion was filed within a reasonable time after the default judgment was entered, commensurate with Rule 74.05(d).

For the reasons given above, we conclude that Ford's first point has merit.[9] The trial court abused its discretion and erred in not setting aside this default judgment. In No. 20988, the trial court's judgment denying the

---

8. Suggestions in support accompanied the motion to set aside the default judgment. Additional filings by Ford on April 10, 1995, were a motion to stay execution on the judgment, suggestions in support thereof, and a request for hearing on the motion to set aside.

9. As Point I is decided favorably to Ford, we need not and do not address Ford's second and third points which made additional contentions as to why Ford claimed the trial court erred in refusing to set aside the default judgment.

**502**

motion to set aside the default judgment is reversed. The case is remanded and the trial court directed to set aside the default judgment and to fix a reasonable time in which Ford shall be permitted to file an answer. We dismiss No. 20987, as Ford has received all the relief in No. 20988 that it sought in No. 20987, thus making the appeal in No. 20987 moot.

CROW, P.J., concurs in separate opinion.

PARRISH, J., concurs.

CROW, Presiding Judge, concurring.

I concur in the principal opinion. I write separately to point out that Rule 74.05(d) authorizes a trial court, in setting aside a default judgment, to condition the order on such terms as are just, including a requirement that the party in default pay reasonable attorney's fees and expenses incurred by the adversary as a result of the default.

In this case, a transcript was prepared of the evidentiary hearing on Ford's motion to set aside the default judgment. Additionally, as explained in the principal opinion, the default precipitated four appeals. Consequently, costs have been generated which must ultimately be borne by someone. Because the default resulted from the dereliction of Ford's lawyers, Plaintiffs should not be saddled with such costs.

As I read the principal opinion, nothing in it bars the trial court from exercising its authority under Rule 74.05(d). I believe the trial court should do so in this case.